This is our last case of the day. It's number 4-14-0746. In the matter of B.B., People's State Homeowners is Heather Breeden. C. Attorney Cagle is here on behalf of the appellant. Attorney Majors is here on behalf of the appellee. Mr. Cagle, are you ready to proceed? Yes, Your Honor. Let me do so. May it please the Court. Your Honors, I represent the responsible mother, Heather Breeden. And I'm here today to ask the Conscience Honorable Court to reverse the trial court's July 29, 2014 ruling terminating the parental rights of Heather Breeden. It is our position that the trial court erred both in its finding of unfitness and in its finding that termination would be in the best interest of the minor child. Speaking first to the issue of the trial court's finding of unfitness, Your Honor, the conditions which led to the removal of the minor child from my client's home were essentially the abuse of cannabis, which led to the child's truancy from school, and Ms. Breeden's inability to maintain a job. Your Honor, it's our position that at the time of the unfitness hearing, that Ms. Breeden had in fact made substantial progress toward the reunification of the child and toward correcting the conditions which led to the child's removal from her home. Specifically, Ms. Breeden had completed and been successfully discharged from substance abuse counseling  for the use of any cannabis or Pepsifis or substitute cannabis substances. In addition, Ms. Breeden had completed an education class. Ms. Breeden had been neutrally discharged from mental health counseling and had been said to have made progress in mental health and individual counseling by her counselor. Ms. Breeden further had maintained a stable home and further had maintained stable employment and was on a continuous two-year period of stable employment. Mr. Cabe, can I ask you a question? During this nine-month period that's at issue in this case, how many times was she incarcerated? Three different short-term stints totaling about 55 days, Your Honor. There was remitted jail time on a misdemeanor drug paraphernalia case in Ford County. On March 4th, Ms. Breeden submitted to a drug test for probation, which tested positive for the presence of amphetamines. This was not the first time this had happened in this case. Ms. Breeden had previously tested positive for what was understood by the probation office and all involved to be a diet pill called FASTA. In spite of this, Ms. Breeden did receive positive permanency reports as recently as February 26, 2013, the very week before this positive drug test. However, when the positive drug test came back on March 4th, 2014, she was arrested on a petition to revoke her probation. Was she sentenced to serve 30 days? She was sentenced to 30, served 15 with good time. That was repeated in August, I believe. May and September, right? In May and September. And each time the length of the sentence grew, didn't it? She initially got a 30-day sentence, then a 40-day sentence, and then a 50-day sentence? I believe that's correct, and that would make sense. That's that total of 15, 20, plus 30 for 55 days total served in county jail during this period, Your Honor. On August 13th, however, of 2013, again during this nine-month period, Heather went to the Prairie Center, which was her drug treatment provider, and got a substance abuse evaluation based on these circumstances. That evaluation is included in the appendix, and the substance abuse treatment provider indicated that no further drug treatment was necessary, and in fact encouraged Heather to go ahead and get a prescription for a drug Adderall, as opposed to using diet pills or taking an old prescription for Adderall, which she had. Your Honor, cannabis use in 2011 was causing my client to be lethargic, not to take care of the child's needs, not to get the child to where the child needed to be, not to be able to hold a job. These are common side effects of people who use cannabis to excess, or in some cases use cannabis at all. By all measures, those problems had been solved. Even in the face of these positive drug screens in 2013, there were no more cannabis positives in any of the drug screens that Heather Greedman took. There was no indication that Heather was not fulfilling employment responsibilities, that she wasn't maintaining a stable home. The February 26th permanency report indicates that in fact she was. She'd been approved for unsupervised visits, was on the road to getting her child back. Then she tests positive for amphetamines in probation, in a probation test, and everything goes downhill from there. She was later given a prescription. Canceled before amphetamines. Didn't she miss a lot of visitation, though? That's really problematic for me. Your Honor, admittedly, during this nine-month period she did miss a lot of visitation, and a part of that was due to the incarceration, and part of that is really not easily explained, admittedly. But, Your Honor, up until the March 4th failed drug test, she had diligently gone to visitation according to the permanency reports. She had been approved for unsupervised visitation and had had a couple of unsupervised visits, but when she went into incarceration in Ford County, as I said, at the trial court level, it all went downhill from there. And at that point, I think, unsupervised visits were stricken by the DCFS. Ms. Breeden had a conversation, at least one conversation with the caseworker, where the caseworker understood Ms. Breeden to say she wanted to terminate her parental rights. Ms. Breeden denied that at an October 1st permanency hearing and denied it at both the unfitness hearing and the best interest hearing. But the die was cast from there. Later in the case, Ms. Breeden, through counsel, wrote a letter to the caseworker and said that she did not intend to surrender her parental rights, and further said that she wanted to re-initiate visitation, but visitation wasn't re-initiated until that letter was written in late 2013. And it went forward from there until the ultimate termination hearing on a supervised basis per the DCFS rules. Your Honor, progress, though measured from an objective standard, and I know the statute allows the court to focus on a specific nine-month period, I think this case represents something a little bit different, though, because many of the affirmative corrections that had to be made, such as the parenting class, such as the counseling, such as the substance abuse evaluation, such as the employment issues, had already been complied with by the time this period started. The report from February 26, 2013, acknowledges there wasn't any more mental health counseling to be done. It acknowledges substance abuse counseling had been completed, parenting education had been completed. So when we talk about progress in the context of a normal case of somebody not getting these things done, that's not what we have here. What we have here is someone that did very well for a period leading up to the March 4th failed drug test, and then due to the incarceration, and I think just due to general discouragement over the way things had gone, had somewhat of a lack of progress during that period. But it wasn't a matter of failing to take the affirmative steps that were required. It's that things didn't progress from unsupervised visits to the child coming back to her home during that period. And I think that represents a different scenario than what's really contemplated by the statute in terms of not making reasonable progress. In terms of the substance abuse, which was the element that got this child removed from Ms. Breen's care in the first place, there is a Prairie Center report during this period that said no further treatment is necessary. So I'm not sure what Ms. Breen was supposed to do to further correct the substance abuse condition once that report had been issued on August 13th of 2013. I don't think that's a failure to make reasonable progress toward the condition that caused the child to be removed from the home. Your Honor, the issue of best interest, though somewhat related, also presents a problem that we think was an error at the trial court level. The child in this case was 13 years old, nearly 14 years old at the time of the best interest hearing. For 11 of those years, the child had resided exclusively in her mother's care. They had built a close relationship. They had a strong bond. That is acknowledged throughout the report. It was acknowledged in the trial testimony by the minor child. It was stated by the mother. And it was acknowledged by the caseworker. And it's acknowledged in permanency reports. There's no issue that this child identified with the respondent as her mother, knew she was her mother, and throughout this case up until essentially the time of these hearings, had maintained hope that she could be reunited with her mother. Didn't she testify that she wanted her mother's rights terminated? That's unusual in these types of cases. Yes, she did, Your Honor. She testified that she wanted her mom's parental rights terminated. But when you read into the transcript of the testimony, it is apparent that she was disappointed in her mother for not getting her back to begin with. She testified that as recently as a couple of months before the hearing, she had told her caseworker that she wanted to be reunited with her mother and wanted to move back with her mother. So she was conflicted on this and was going back and forth, even though her testimony was admittedly unwavering. The child testified that she had seen things on Facebook, was keeping up with her mom on Facebook, and thought that maybe she had and her mom, in fact, changed. When I asked the child on my cross-examination what changes she wanted her mom to make so she could live with her again and would want to live with her again, the child said, I'd like to be able to stay in the same home for a year and I'd like her to keep a job. Well, the child wasn't aware that she had kept a job. She'd been employed at the same place for over a year. She'd maintained stable employment for the prior two years. She had maintained a stable residence. There was no issue at the trial court level of mom not being able to keep a job or not being... But the child was aware that she hadn't visited much with her mother in the course of the year and that her mother had been taken back into jail on several occasions. She was aware of that. And I think she testified that when she became aware of that, she kind of gave up, she being the child. She thought that her mom would never change, I think, was the trial testimony. Your Honor, I don't think the child was aware of the changes her mom had made. I think all she knew was that her mom, that she had unsupervised business, they were close to reaching the finish line, and mom, for some reason or another, got put back in jail. And I think that just totally shot the child's trust out the window. I think this could have been handled differently. I think the child should have been advised that mom wasn't using cannabis again, wasn't back to the same things that got her removed from the home, that this was a different issue and an issue that was later treated with a prescription drug from her physician to treat her depression. So I don't think the child had all the facts here, and I don't think a 14-year-old could even absorb all the facts. Fourteen-year-olds don't know about probation, revocations, and these type of things, or at least they shouldn't. And I think in this circumstance, the child leaped to a conclusion because she heard her mom got put back in jail, and that's why she wasn't having business this week. Your Honor, this could have been handled differently. This was not the condition that caused the child to be removed from the home, and there was not any indicia that substance abuse had reoccurred at the level it was at to cause the child to be removed from the home. It was causing mom to be erratic in her day-to-day behavior, unable to hold a job. This was a positive test under different circumstances. They got treated very partially in a probation-revocation context. And in my judgment, Your Honor, it's about how it cost mom her parental rights. I think at that point, mom was discouraged, the child was discouraged, and it went from there. But I don't think that means that it's in the child's best interest to have a 13-year relationship severed. These parties live in an extremely small community. Gibson City, Illinois, a town of about 3,500 people. The foster mother in this case, or foster parent in this case, was the child's godmother. This child very well knew who her mom was. She very well knew her mom in a parental context. She had always understood herself to be with a foster parent on a temporary basis as contemplated by the law, and so mom changed, to use the child's words. I think mom had changed, and I think the evidence indicates that mom had changed from the employment improvements. She had two jobs at the time of this best interest hearing. She was passing drug tests at the time of this best interest hearing. Multiple drug tests that were clean except for her prescription medication. She maintained stable housing at the time of the best interest hearing. She was back in counseling. I think that mom had changed, and I think that this relationship here, the 13-year relationship, was strong enough that it was worth saving to give mom a chance to get this finished. I think she did have a nine-month period that certainly wasn't as good as the previous nine-month period. But the trial court acknowledged that mom had made progress in the nine months up to the hearing. The trial court acknowledged that mom had done some good things. The trial court lamented that had mom done some of these things in the first nine months, maybe we wouldn't be here. Your Honor, mom had done those things in the first nine months. She had a lapse from March 4th through basically September 1st of 2013. And some of that was due to the incarceration, due to the failed drug test. But, Your Honor, again, I think to terminate a parental rights on a 13-year-old child when mom has... Mom's most serious criminal offense is a misdemeanor drug paraphernalia charge. That's what we have here. And mom is providing clean drug tests showing she's not using cannabis anymore, providing pay stubs showing she's got two jobs. The case law indicates that we don't compare cases, that every case is pretty much different in these types of cases. But I think the case law always says that the benchmark is the fitness of the parent in relationship to the needs of the child. And in this case, mom had made tremendous improvements to come fit at the time of this best interest hearing. And I think that the 13-year-old, again, had an identity of misbehaving as her mother. She may have been mad at her mother. But I don't think that justifies the court's termination of parental rights. Counsel, I assume all these arguments were made to the trial court, but they were rejected. And you know our standard of review. Your Honor, I see... You've got until the red comes on, so you're not quite there. Thank you, Your Honor. Yes, admittedly, these were made at the trial court level. They were rejected at the trial court level. And these are factual arguments, and I understand we have a manifest way for the evidence standard. I would note, however, that one of the things that the trial court really seemed to pay a lot of attention to at the unfitness hearing was whether mom had, in fact, indicated that she wanted to surrender her parental rights. And the trial court looked at the docket and said that mom didn't object to the caseworker saying she wanted to terminate her parental rights. Your Honor, that's a factual error by the trial court. If you look at C-3 of the record, the court's docket entry on October 1, 2013, indicates that mother denied statement of intent to surrender. When mom saw the permanency reports and realized that the court thought that she had indicated an intent to surrender, she went to counsel and said, clear this up, clear this up. And this was made known to the trial court on 10-1-2013. And it's reflected in the transcript from that day, and it's reflected in the court's docket. So to the extent that played a role in the court's factual findings, I'd ask that the reviewing court review the docket there. That's just factually not what happened. I would note that this case involved a lot of changing of people. The original trial court retired during the course of this case. The caseworker was switched during the course of this case. Respondent mother's counsel was switched during the course of this case. There was not a lot of continuity in either the trial court, caseworker, or counsel level here, and I think that contributed to some of the misunderstandings. Your Honor, I see I'm out of time. Okay, thank you, Mr. Fager. Mr. Majors. May it please the court, counsel. I think counsel has done everything he could possibly do for respondent mother and has done an excellent job. I'd just like to point out a few things. Counsel has referred to this October 1, 2013 hearing, I think five times anyway. I don't know what volume it is in the record, but it's marked October 1, 2013. I think it was, and that is into the eighth month of the time period out of nine. Mr. Rumley was then representing respondent mother, and I'm on page 10 for the convenience of your staff. Mr. Rumley, Your Honor, I would agree with the recommendations referring to what the State had just said by Mr. Fitton, who I now know as a judge, I guess, continue on with the lawyer for respondent. I agree with the representation by Mr. Fitton that Ms. Breeden has not made progress. So that's her lawyer eight into the nine months admitting that she didn't make progress. As Justice Sterner has already pointed out, these arguments rest on credibility, and the trial judge has already made his determinations on credibility. And this idea that mother is not to blame for anything, and that she took some diet pills, and that caused her to go to prison, and this caused this spiral out of control, outside of her control, the judge didn't buy that, and they took judicial notice of the criminal case, and the judge of the criminal case didn't buy that. And I was reviewing the file this morning, and in their brief they call attention to page C-246 for the convenience of your staff, as showing that this diet pill causes fasting, causes false results, common law record C-246, positive for opiates on 6-18-12, positive for opiates on 6-29-12. Now, at trial, now here they say this fasting causes false positives for amphetamines, so it must be quite a pill. It causes false positives for downers, and it causes false positives for uppers. I would suggest to the court that the trial court was correct and found that Ms. Breeden was lying, that she was taking drugs in violation of her probation, and blaming it on these over-the-counter pills. And also, if you go through the record, you'll find out sometimes she says these over-the-counter pills caused it, and sometimes she says they were prescription, again, indicating that she's not telling the truth. Counsel's referred several times, I think, to A-19, the appendix for a respondent, talking about she doesn't need any more drug treatment. That's from the Fort County Probation Office. That's not from the court that decided on fitness and best interest. And Hobbs testified, who the trial court found to be a lot more credible than respondent, and who was corroborated by the minor. I've called her B-K-B, and I've noticed the court calls her B-B. She's 14 now. She's not 13. But the trial court found those two very credible, and found respondent mother not to be credible. So this same argument that they made at the trial level is being remade again. It's sort of like, in a criminal case, making a reasonable doubt argument after the jury's already found who they thought was telling the truth and who they wasn't, or who the trial judge thought was telling the truth or who they wasn't. So it's just a matter of credibility. Who do you believe? Well, the trial judge did not believe her. But even accepting everything they say, she admitted she was discharged from counseling. Now, they're going to get up and say that was a goodful discharge. But if you look at the record, you'll find out that she was discharged for failure to attend. If she was taking something that caused a violation of drug screens that wasn't illegal, she kept taking it. She kept taking it three more times and went to jail three more times. She admitted that her record of contacts with her daughter was, in her word, horrible. And at the best interest hearing, the trial judge judicially noticed the entire record. And if you look at that record, if your staff looks at that record again, you'll see that the reason for those tests is that she was seen in the company of a known methamphetamine dealer. And if you look through this whole record, that word with regard to respondent mother, the miner's father who surrendered his rights, and this burtler, or burtly, that methamphetamine word comes up over and over and over. Another phrase that comes up over and over is a drug paraphernalia. Another phrase that comes up over and over is alcohol. Another phrase that comes up over and over is smoking. Now, lastly, I've noticed that the trial court found that she failed to make reasonable efforts and reasonable progress. And they have not challenged reasonable efforts. I noticed in their appendix they attached the statute. And I've learned something because I thought it was only the first nine months with regard to efforts and then nine-month period with regard to progress. But their statute, and it's news to me, says any nine-month period for either one. So if that's true, I think the trial judge found that she failed to make reasonable efforts and she failed to make reasonable progress, and they have not challenged reasonable efforts. I'm looking for it because I can see it. I'm at page 129 of the unfitness hearing. And the trial judge said, really the state's case addressed the second component of that count. I'm going to address that issue. Because I do think there was sufficient evidence presented to prove the first element by clear and convincing evidence. I interpret that to mean reasonable efforts. And then the court says, so the court finds that the allegation of count two in the second amended petition has been proven by clear and convincing evidence and finds the mother unfit. Now, I think there the trial judge finds that she failed to make reasonable progress. Lastly, they keep saying, well, she went, the child was taken because of marijuana and she didn't have a marijuana problem anymore. Well, with reasonable progress, the court knows it's not only the original condition, but it's whatever other things the court's ordered her to do. And after the dispositional hearing, or at the dispositional hearing, the court ordered her not to engage in any illegal substance. So, the fact that she apparently no longer uses marijuana doesn't exculpate her from failure to make reasonable progress. Now, that's the best interest. I don't see any conflicts there. You have a 14-year-old girl. I know the court has handled, played a major role in thousands of these cases. I've played minor roles in a few cases. I've never seen a 14-year-old, 13-year-old with such wisdom and maturity. Even the dry record shows that. She does not want to be with her mother anymore. She wants stability. She wants an education. Everything in here shows that she excelled academically, emotionally, any way you can think of, she excelled when she was removed from this environment that's been going on for 14, 15 years. Mr. Burkler and the drug gambling report. Questions? I don't see any. Thank you, Mr. Majors. Mr. Cagle, any rebuttal? I don't believe that the trial court made a specific finding as to the lack of reasonable efforts. The state did not proceed on the count related to reasonable efforts. They dismissed that count at trial. I think that was count one of the petition. And they picked out, as they're entitled to, a specific nine-month period, being February 1st, 2013 to November 1st, 2013, during which they alleged that Ms. Breeden did not make reasonable progress, the objective standard as opposed to the subjective standard of reasonable efforts. And I think the court acknowledged that, again, the state didn't proceed on the efforts issue and that we were dealing with the objective standard of reasonable progress. During that particular nine-month period, the affirmative obligations of substance abuse treatment, mental health counseling, and parenting education had been completed. The second substance abuse assessment was done after multiple failed amphetamine tests with the Ford County Probation Department that said no further treatment. And the employment and housing issues were not an issue raised at trial court as a basis for unfitness. So I think that's the reasonable progress we're dealing with here. That's for the unfitness element. I don't see how, overall, in the context of the case, Ms. Breeden's efforts could be questioned, given all that she did complete. Because Breeden was close to the finish line as of, well, during this period. That report stated February 26, 2013. During the nine-month period, Heather Breeden was deemed by her caseworker to be on the road toward reunification. Unsupervised visits had been approved. March 4, when the failed drug test and probation happened, and the subsequent three periods of incarceration that the court inquired about. That's what set this toward termination. And I think Ms. Breeden tried to do some things right to correct it, including the substance abuse evaluation that took place on August 26, 2013. I think she tried to do some things right in the best interest context, including providing her own drug test, showing that she wasn't using anything outside of her prescriptions, showing her employment history. I think she tried to show that she corrected the conditions, and I think she presented evidence that it was really undisputed that she corrected those conditions. I can't argue what the child testified to, other than to say she had a difference of opinion and wanted to live with her mom a couple months earlier. I don't know if it's as solid as it appeared in the dry record, in terms of the child's wishes. But I think that reasonable progress had been made, and I think that the best interest of the child would have been to give mom some additional time to continue the guardianship, and that's what I asked the court to do. I understand I'm dealing with a manifest way evidence standard, but I'm asking the court to apply that standard and overturn the trial of courts disabling the permanency of its previous guardians. That's all the questions. Thank you. Thank you, counsel. We'll take this matter under advisement. We'll be in recess.